JOSLYN HUNT
Assistant Federal Defender
Federal Defenders of Montana
Helena Branch Office
50 W. 14th Street, Suite 1
Helena, Montana 59601
Phone: (406) 449-8381
Fax: (406) 449-5651
Email: joslyn_hunt@fd.org
     Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>K. JEFFERY KNAPP,<br><br>Defendant. | CR 19-03-H-CCL<br><br><br><br>**DEFENDANT KNAPP'S SENTENCING MEMORANDUM** |

## I. INTRODUCTION

Defendant K. Jeffery Knapp (Mr. Knapp), by and through his undersigned counsel and the Federal Defenders of Montana, offers the following memorandum in aid of sentencing currently set down before this Court on May 21, 2020, in Helena at 10:00 a.m.

///

1

## II. PRESENTENCE REPORT OBJECTIONS

A copy of the pre-sentence report (PSR) was provided to Mr. Knapp. A review of that PSR occurred and corresponding corrections/clarifications as well as objections were prepared. A few of the objections remain outstanding so Mr. Knapp repeats his objections herein, arguing for a two-level reduction for acceptance of responsibility and a base offense level beginning at 14.

**Acceptance of Responsibility**

The PSR states that Mr. Knapp "has not clearly demonstrated acceptance of responsibility for the offense." Nowhere does the draft PSR indicate why this is true. Mr. Knapp should at least receive a two-level reduction for accepting responsibility since he has never denied possessing firearms, and he was cooperative in the officers' search of his home to confiscate the firearms. While it is true that Mr. Knapp exercised his constitutional right to a trial, that trial concerned application of the statutory elements to his status as a prohibited person—not the fact he possessed the firearms. Such a position is precisely addressed in the comments to USSG §3E1.1.

> Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the

2

> applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

USSG §3E1.1, Application Note 2. *See United States v. Paredes-Batista*, 140 F.3d 367, (2nd Cir. 1998) (denying acceptance of responsibility adjustment because the defendant did not proceed to trial for the purpose of asserting a collateral attack on the legality of his underlying deportation); *Compare with United States v. Fells*, 78 F.3d 168, 171 (5th Cir. 1996) (granting acceptance of responsibility adjustment where the defendant asserted the underlying facts of his offense did not legally constitute possession under the statute and challenged the district court's venue); *United States v. Rojas-Flores*, 384 F.3d 775 (9th Cir. 2004) (granting acceptance of responsibility adjustment where the defendant challenged the applicability of the statute, not the factual elements of guilt).

**Crime of Violence**

The PSR indicates that Mr. Knapp's base offense level is set at 22 because he previously sustained a felony conviction of a crime of violence. (*See* ¶27). Mr. Knapp objects to this assertion. The PSR focuses on Mr. Knapp's underlying offense of second degree sexual assault that he sustained in Colorado on November 17, 1994.

The statute in effect at the time Mr. Knapp was charged for second degree sexual assault stated as follows:

Any actor who knowingly inflects sexual penetration or sexual intrusion on a victim commits sexual assault in the second degree if:

(a)   The actor causes submission of the victim to sexual penetration by any means other than those set forth in 18-3-402, but of sufficient consequence reasonably calculated to cause submission against the victim's will; or

(b)   The actor causes submission of the victim to sexual intrusion by any means other than those set forth in section 18-3-402, but of sufficient consequence reasonably calculated to cause submission against the victim's will.

C.R.S. §18-3-403(1) (1990).

The means set forth in §18-3-402 included the following:

(a)   The actor causes submission of the victim through the actual application of physical force or physical violence; or

(b)   The actor causes submission of the victim by threat of imminent death, serious bodily injury, extreme pain, or kidnapping, to be inflicted on anyone, and the victim believes that the actor has the present ability to execute these threats; or

(c)   The actor causes submission of the victim by threatening to retaliate in the future against the victim, or any other person, and the victim reasonably believes the actor will execute this threat. As used in this paragraph (c), "to retaliate" includes threats of kidnapping, death, serious bodily injury, or extreme pain; or

(d)   The actor has substantially impaired the victim's power to appraise or control the victim's conduct by employing, without the victim's consent, any drug, intoxicant, or other means for the purpose of causing submission; or

(e)   The victim is physically helpless and the actor knows the victim is physically helpless and the victim has not consented.

C.R.S. §18-3-402(a)-(e) (1990).

It follows from the United States Supreme Court decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015) that to qualify as a "crime of violence" an offense must either: (1) involve "the use, attempted use, or threatened use of physical force;" or (2) be one of the generic offense (burglary of a dwelling, arson, extortion, or involve use of explosives) listed in USSG §4B1.2(a)'s enumerated offense clause. Because Mr. Knapp's underlying second-degree sexual assault conviction does not involve the use of force or qualify as an enumerated offense, his underlying offense cannot be considered a crime of violence setting his base offense level at 22.

In order to determine whether an offense qualifies as a violent felony under either the force or enumerated offense clause, courts must apply the categorical approach described in *Taylor v. United States*, 495 U.S. 575 (1990). *See United States v. Lawrence*, 627 F.3d 1281, 1285 (9th Cir. 2010) (force clause); *Descamps v. United States*, 133 S. Ct. 2276, 2281 (2013) (enumerated offense clause). The categorical approach requires courts to "look to the elements of the offense rather than the particular facts underlying the defendant's own [case]." *United States v. Dominguez-Maroyoqui*, 748 F.3d 918, 920 (9th Cir. 2010). In identifying the elements of a statute, courts consider the language of the statute, judicial opinions interpreting it, and any relevant pattern jury instructions. *Rodriguez-Castellon*, 733 F.3d 847, 853 (9th Cir. 2013); *Rivera v. Lynch*, 816 F.3d 1064 (9th Cir. 2016) (using model jury instructions to evaluate the scope of California's perjury statute).

Because the categorical approach is concerned only with what conduct the offense necessarily involves, a court "must presume that the [offense] rest[s] upon nothing more than the least of the acts criminalized, and then determine whether even those acts are encompassed by the generic federal offense." *Moncrieff v. Holder*, 133 S. Ct. 1678, 1684 (2013). If the elements of the offense "criminalize a broader swath of conduct" than the conduct covered by the general federal definition, the offense cannot qualify as a crime of violence, even if the particular facts underlying the defendant's own case might satisfy that definition. *Dominguez-Maroyoqui*, 748 F.3d at 920.

When reviewing a "divisible" statute, a court may go beyond the categorical approach and apply the "modified categorical approach." Under the modified categorical approach, a court may "examine a limited class of documents to determine which of a statute's alternative elements formed the basis of the defendant's prior conviction." *Descamps*, 133 S. Ct. at 2284. A statute is divisible when it contains "multiple, alternative elements of functionally separate crimes," rather than just "alternative means of committing the same crime." *Ramirez v. Lynch*, 810 F.3d 1127, 1134 (9th Cir. 2016). "[T]he key question [a court] must ask when determining a statute's divisibility is whether a jury would have to be unanimous in finding those separate elements." *Ramirez*, 810 F.3d at 1133.

To qualify as a violent felony under §4B1.2(a)'s force clause, an offense must require proof, as a necessary element, that the defendant used, attempted to use, or threatened to use physical force. *Johnston (Curtis) v. United States*, 559 U.S. 133 (2010). Force, in this context, refers to "violent force—that is, force capable of causing physical pain or injury to another person." *Id.* at 140. It must be intentionally applied, not just recklessly or negligently. *Leocal v. Ashcroft*, 543 U.S. 1, 12-13 (2004); *United States v. Vederoff*, 914 F.3d 1238, 1248 (9th Cir. 2019).

In determining whether an offense qualifies as a violent felony under the enumerated offense clause, courts must "compare the elements of the statute forming the basis for the defendant's conviction with the elements of the 'generic' crime, or the offense as commonly understood." *United States v. Dixon*, 805 F.3d 1193 (9th Cir. 2015). If the statute defines the crime in the same, or narrower, terms as the "generic" offense, then the prior conviction can be used as a guideline-enhancing predicate. But, if a statute defines a crime more broadly than the generic crime, the offense cannot count as a predicate, even if the defendant actually committed the crime in its generic form. *Descamps*, 133 S. Ct. at 2284.

Here, second degree sexual assault is not an enumerated offense under USSG §4B1.2(a)(2). Therefore, to qualify as a violent felony, a conviction under C.R.S. 18-3-403 (1990) must require proof, as a necessary element, that the defendant used, attempted to use, or threatened to use physical force. Physical force in this context

refers to "destructive or violent force." *United States v. Zuniga-Soto*, 527 F.3d 1110, 1122 n.3 (10th Cir. 2008); *Lawrence*, 627 F.3d at 1284 ("the phrase 'physical force' means violent force—that is, force capable of causing physical pain or injury to another person"). It must be intentionally, not just reckless or negligently, applied. *Leocal*, 543 U.S. at 12-13; *Vederoff*, 914 F.3d at 1248.

A conviction for felony second-degree sexual assault under the former Colorado statute 18-3-403 (1990) is not a violent felony under §4B1.2's force clause. By its very terms, it does not require proof that the defendant used "violent or destructive force." *Chrzanoski v. Ashcroft*, 327 F.3d 188, 192 (2nd Cir. 2003). Indeed, the statutory elements of the offense direct that a person commits the offense of second-degree sexual assault if that person either sexually penetrates or sexually intrudes another by means other than the forceful means delineated under C.R.S. §18-3-402 (1990).

The probation officer is wrong to state Mr. Knapp's prior conviction qualifies as a crime of violence. Such a simplistic approach to the analysis of that question, as evidence in the Addendum to the PSR, is not what the law mandates.

**Assault Weapons Ban**

The PSR indicates that Mr. Knapp's base offense level is set at 22 due to his offense involving a "semiautomatic firearm that is capable of accepting a large capacity magazine." (*See* ¶27). Mr. Knapp objects to this assertion. In *United States*

8

*v. English*, the Ninth Circuit succinctly set forth the history of the assault weapons ban:

> The enhancement in § 2K2.1 for semiautomatic firearms was adopted at the direction of Congress pursuant to the Violent Crime Control and Law Enforcement Act of 1994. Among other provisions, that Act introduced a national "assault weapons ban," which covered firearms such as the semiautomatic rifle that English possessed. In response, the Sentencing Commission amended the enhancement in § 2K2.1(a)(4)(B)--which already applied to sawed-off shotguns, silencers, machine guns, bombs, grenades, rockets, and poison gas devices, see 26 U.S.C. § 5845(a) & (f)--to include the semiautomatic weapons banned by the Act.
>
> Congress allowed the assault weapons ban to lapse on September 13, 2004. In addition, Congress commissioned a study conducted after the enactment of the ban, which made findings that appear to undermine the rationale for the ban. See Jeffrey A. Roth et al., Urban Institute, Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994, at 2 (Mar. 1997).
>
> Despite Congress's repeal of the ban, and the findings of its study in support of that repeal, the Sentencing Commission in 2006 decided to retain the § 2K2.1 enhancement for semiautomatic weapons, and in fact expanded its definition into its current form. The only reason given by the Commission for the 2006 Amendment was "inconsistent application" of the enhancement "in light of the ban's expiration." USSG, App. C, amend. 691 (Nov. 1, 2006). The Commission never addressed whether the enhancement for semiautomatic firearms should continue to apply or continue to apply to the same degree after Congress had repealed the Act under which it was initially adopted, or in light of the findings in the congressional study.

*English*, 333 F. Supp. 3d at 1313-1314.

Considering that the assault weapons ban expired, possession of a semiautomatic weapon with a large capacity magazine, without more, cannot and

9

should not warrant an increase in an individual's base offense level. Under 28 U.S.C. §994(c) the Sentencing Commission is supposed to be guided by the following in framing a guideline that governs imprisonment as a sanction:

> (c) The Commission, in establishing categories of offenses for use in the guidelines and policy statements governing the imposition of sentences of probation, a fine, or imprisonment, governing the imposition of other authorized sanctions, governing the size of a fine or the length of a term of probation, imprisonment, or supervised release, and governing the conditions of probation, supervised release, or imprisonment, shall consider whether the following matters, among others, have any relevance to the nature, extent, place of service, or other incidents [incidence] of an appropriate sentence, and shall take them into account only to the extent that they do have relevance—
>
> (1) the grade of the offense;
>
> (2) the circumstances under which the offense was committed which mitigate or aggravate the seriousness of the offense;
>
> (3) the nature and degree of the harm caused by the offense, including whether it involved property, irreplaceable property, a person, a number of persons, or a breach of public trust;
>
> (4) the community view of the gravity of the offense;
>
> (5) the public concern generated by the offense;
>
> (6) the deterrent effect a particular sentence may have on the commission of the offense by others; and
>
> (7) the current incidence of the offense in the community and in the Nation as a whole.

*See* 28 U.S.C. §994(c).

Examining these factors in light of the history of the assault weapons ban, as recounted in the *English* decision, there is no factor or set of factors as listed in 28 U.S.C. §994(c) warranting an increase in offense level for semiautomatic firearms with high capacity magazine. Possession of the same cannot be considered a free standing aggravating factor, since such weapons are lawful for non-felons and do not suggest inherent danger. Nor are there circumstances in this record which suggest intended violence for the offense of conviction. Next, no harm to person or property occurred. And as for "community view", "public concern" and/or "deterrent effect" (§994(c)(4), (5) and (6)) the assault weapons ban expired, which resolves those concerns.

If Congress allowed the assault weapons ban to expire rendering possession of such by non-felons lawful there is no justification for effecting a disproportionate increase for a felon who possesses such firearms, absent some independent aggravating factor. Seeing none in this record, Mr. Knapp argues that his base offense level should be 14.

Mr. Knapp's total offense level should be 16 (four-level enhancement for firearms minus two-point reduction for acceptance of responsibility) with a resulting guideline range (at a criminal history category I) of 21 to 27 months.

///

///

## III. SENTENCING ARGUMENT

Mr. Knapp stands six feet, six inches tall. By all accounts, he is a large man, and what has become apparent during the course of his case is that Mr. Knapp is larger than life in what he gives to his family and his community.

Mr. Knapp has not had an easy life. Whether or not one chooses to think he brought those difficulties on himself, one cannot deny he has overcome adversity. Having graduated from high school after prison, he taught himself the "ins and outs" of computers in such detail that he was also able to build from the ground up a thriving computer business. That business has now suffered due to his conviction and, most recently, the COVID-19 pandemic, but it once employed 11 others and kept his family living a very comfortable upper middle class lifestyle. He and his wife, Kaydee, built their dream home in Clancy, Montana, with acres of land for their daughter on which to play and explore.

For over 20 years, Mr. Knapp has been a contributing member of the Helena community. He has remained employed and has given back by volunteering. He has also lived under conditions for the past year without incident. We contend that he may continue to do so while rehabilitating himself upon a probationary sentence. Such a sentence would also address what is a real and viable concern—that is, Mr. Knapp meets the criteria as a vulnerable person potentially entering the prison population during a global pandemic.

As of April 8, 2020, the new strain of coronavirus which causes COVID-19 has infected at least 418,185 people, resulting in 14,257 deaths in the United States, alone. *See Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (April 8, 2020), *available at* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html. In the interest of time, we spare the Court a detailed review of the development of the pandemic and the devastation it has wrought. Suffice it to say that the nation and the world are presently confronting a lethal health crisis, the likes of which have never existed in modern times.

As COVID-19 gains strength and lethality depending on the relative health and or age of the host it infects, the elderly and those with pre-existing conditions are substantially more likely to die than younger persons or those in good health with robust immune systems. *See* CDC, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)* (updated March 30, 2020). The CDC's guidelines call for people over the age of 60 and people with chronic health conditions including cancer to take immediate preventative action. *See* CDC, *People at Risk for Serious Illness from COVID-19*) (March 31, 2020), *available at https://bit.ly/2vgUt1P*.

Correctional experts from New York to Colorado agree that in view of the pandemic, we must take the extraordinary step of releasing elderly and other

compromised prisoners where it is possible to do so. *See e.g.*, "A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the *Coronavirus*," The New Yorker Magazine (March 20, 2020), *available at* [https://www.newyorker.com/news/news-desk/a-rikers-island-doctor-speaks-out-to-save-her-elderly-patients-from-the-coronavirus](https://www.newyorker.com/news/news-desk/a-rikers-island-doctor-speaks-out-to-save-her-elderly-patients-from-the-coronavirus). Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease. *See* Joseph A. Bick, "Infection Control in Jails and Prisons," *Clinical Infectious Diseases* 45(8):1047-1055 (2007), *available at* [https://doi.org/10.1086/521910](https://doi.org/10.1086/521910). Inmates cycle in and out of detention facilities, and the people who work in those facilities including correctional officers and care and service providers, leave and return daily without screening. Incarcerated people as a whole have poorer health than the general population and, even in the best of times, medical care is limited. *See generally* Laura M. Maruschak, et al., US DOJ, Bureau of Justice Statistics, "Medical Problems of State and Federal Prisoners and Jail Inmates," *available at* [https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf](https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf).

Mr. Knapp implores this Court to consider these arguments when fashioning a sentence.

## IV. 18 U.S.C. §3353(a) FACTORS

The relevant sentencing factors are set forth in 18 U.S.C. §3553(a)(2), which we address briefly:

(1) *Nature and Circumstances of the Offense*

Mr. Knapp stands convicted of being a prohibited person in possession of a firearm, in violation of 18 U.S.C. §922(g)(1). The acknowledged statutory maximum term of imprisonment is 10 years.

(2) *History and Characteristics of the Defendant*

These factors are adequately addressed in the PSR. Mr. Knapp emphasizes, however, that he suffers from chronic heart disease and heart failure, high blood pressure, and type 2 diabetes. (*See* ¶¶73, 76).

(3) *Seriousness of the Offense*

Mr. Knapp agrees that his offense is serious.

(4) *Deterrence and Protection of the Public*

Both general and specific deterrence will be promoted by a sentence imposed. We argue, however, that the sentencing factors can be—and will be—fulfilled by sentencing Mr. Knapp to a 24-month probationary term.

(5) *Promotion of Respect for the Law*

Mr. Knapp's conduct exhibited little respect for the law. Moving forward, however, he intends to stay within the bounds of the law.

///

///

///

15

(6) *Need to Provide Defendant With Education, Training, Medical Care or Other Correctional Treatment*

There does not appear to be any cogent reason why Mr. Knapp needs to be in prison for treatment, education or training. All that he needs in terms of those services can be obtained in a community supervision setting.

(7) *The Applicable Guidelines*

Here, if this Court sustains his PSR objections, Mr. Knapp's advisory guideline range is 21 to 27 months. Even if this Court disagrees, this Court may still vary from the government's suggested advisory guideline sentence of 63 to 78 months. Mr. Knapp appreciates that his request is far afield from the government's. However, in this case, such a variance is warranted.

## V. SENTENCING WITNESSES

Undersigned counsel may have up to six separate witnesses who want to speak in support of Mr. Knapp. We expect this will consume about 30 minutes, including cross-examination.

## VI. PRISON RECOMMENDATION; SELF-SURRENDER; RELEASE PENDING APPEAL

Should this Court sentence Mr. Knapp to the custody of the Bureau of Prisons, we request a recommendation from this Court for him to serve his time at a facility as close to Montana as possible so he may be nearer family, assuming his family under the pandemic will be permitted to travel in the future. Mr. Knapp also asks

16

that he be permitted to self-surrender. In that regard, we remind the Court that Mr. Knapp has been on conditional release since April 4, 2019, and has had no problems. Finally, under separate filing, Mr. Knapp will request that he be released on conditions pending appeal of his conviction.

## VII. CONCLUSION

WHEREFORE, Mr. Knapp prays this Court will consider this memorandum in aid of sentencing.

Respectfully submitted this 9th day of April, 2020.

/s/ Joslyn Hunt
JOSLYN HUNT
Assistant Federal Defender
Counsel for Defendant

# CERTIFICATE OF SERVICE
## L.R. 5.2(b)

I hereby certify that on April 9, 2020 a copy of the foregoing document was served on the following persons by the following means:

<u> 1 </u>  CM-ECF

<u> 2 </u>  Mail

1.  CLERK, UNITED STATES DISTRICT COURT

1.  J. THOMAS BARTLESON
   Assistant U.S. Attorney
   U.S. Attorney's Office
   901 Front St., Ste. 1100
   Helena, MT  59626
     Counsel for the United States of America

2.  K. JEFFERY KNAPP
     Defendant

            /s/ Joslyn Hunt
            FEDERAL DEFENDERS OF MONTANA